# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL COUNSEL BUREAU,

     **Plaintiff,**

        v.

U.S. CENTRAL INTELLIGENCE AGENCY, et al.,

     **Defendants.**

Civil Action No. 09-2269 (JDB)

## MEMORANDUM AND OPINION

Plaintiffs International Counsel Bureau and Pillsbury, Winthrop, Shaw, Pittman, LLP (collectively, "ICB") bring this action against the United States Central Intelligence Agency ("CIA" or "the Agency") and others, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. 552 et seq., seeking records pertaining to four individuals allegedly detained (or previously detained) at Guantanamo Bay Naval Base, Cuba. Plaintiffs pursue several FOIA requests to the CIA and other agencies seeking (a) records containing references to or reflecting the terms of the U.S. government's policies and practices relating to the transfer or release of detainees held at Guantanamo and (b) records relating to four current and former detainees at Guantanamo: Fawzi Khaled Abdullah Fahad Al Odah, Khalid Abdullah Misha'al Al-Mutairi, Fouad Mahmoud Al Rabiah and Fayiz Mohammed Ahmed Al Kandari ("detainees"). Now before this Court is the CIA's motion for partial summary judgment and the plaintiffs' cross-motion for summary judgment with respect to ICB's request to the CIA for detainee-specific records. At issue is whether the CIA properly issued a "Glomar" response to ICB's FOIA request for records concerning the detainees, neither confirming nor denying the existence of

responsive records.

**BACKGROUND**

ICB has made a series of FOIA requests to several agencies in this action, as well as a related action before this Court, International Counsel Bureau v. U.S. Dep't of Defense, 08-cv-01063 (JDB), seeking records relating to the four aforementioned detainees.  However, the Agency's partial summary judgment motion and ICB's cross-motion for summary judgment concern only the propriety of the CIA's "Glomar" response to ICB's requests for information, as set forth in paragraphs 65-66 of the amended complaint.[1]  Accordingly, this Memorandum Opinion addresses only the FOIA requests at issue in these motions.

On September 4, 2009, ICB submitted two FOIA requests to the CIA.  The first request sought:

> Any and all records relating to or reflecting any alleged breaches or violations by the Detainees of any governing rules of discipline and/or behavior during their detention by the United States Government ("USG").  This request includes, but is not limited to, records related to any disciplinary actions taken by personnel in response to such breaches.
>
> Any and all records relating to or reflecting any investigations into alleged abuse or mistreatment of any of the Detainees while under the control of the USG.  This request includes, but is not limited to, records related to any disciplinary actions taken against USG personnel for engaging in such abuse or mistreatment.
>
> [a]ny recording, including any image, photograph, picture, film, drawing, painting, video, videotape, tape recording, audiotape, CD, or DVD, depicting or reflecting the image, likeness, voice, audible

---

[1] In paragraph 67 of its amended complaint, ICB also describes records it sought from the CIA "related to current U.S. policy and/or negotiations regarding Guantanamo Bay." That FOIA request is not implicated in either the CIA's motion for partial summary judgment or ICB's cross-motion, and hence the Court need not address that request to resolve the motions before it.

action, or any other aspect or activity of any [of the four detainees].

Am. Compl. ¶ 65; see also Ex. A to Declaration of Ralph S. DiMaio, Information Review Officer for the National Clandestine Service, CIA ("DiMaio Decl.").

The CIA responded by letter dated September 23, 2009, indicating that plaintiffs had submitted a previous request for information related to the four individuals, which had already been denied. See Ex. B to DiMaio Decl. ICB subsequently asked that the CIA treat the September 4, 2009 FOIA request as a new request, rather than an appeal. In a reply letter, the CIA agreed but also denied the FOIA request itself, informing plaintiffs that:

> [i]n accordance with section 3.6(a) of Executive Order 12958, as amended, the CIA can neither confirm nor deny the existence or nonexistence of records responsive to your request. The fact of the existence or nonexistence of requested records is currently and properly classified and is intelligence sources and methods information that is protected from disclosure by section 6 of the CIA Act of 1949 as amended. Therefore, your request has been denied pursuant to FOIA exemptions b(1) and b(3).

Ex. D to DiMaio Decl. ICB had also submitted another FOIA request seeking "a complete set of medical records and / or psychological records..." relating to Fouad Mahmoud Al Rabiah and Fayiz Mohammed Ahmed Al Kandari. Ex. G to DiMaio Decl. The CIA denied this request as well, and issued exactly the same response as quoted above. See Ex. H to DiMaio Decl. The CIA now moves for partial summary judgment with respect to the appropriateness of its "Glomar" response to both requests. ICB opposes the CIA's motion, challenging the CIA's invocation of Exemptions (b)(1) and (b)(3) as the basis for its "Glomar" response, and also cross-moves for summary judgment, contending that the CIA's search was inadequate; ICB requests that this Court order the CIA to conduct an adequate search of all its department and staff

functions.

## STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings . . . and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party opposing a motion for summary judgment, however, "may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The nonmoving party must do more than simply "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Any factual assertions in the movant's affidavits will be accepted as being true unless the opposing party submits his own affidavits or other documentary evidence contradicting the assertion. Neal v. Kelly, 963 F.2d 453, 456 (D.C. Cir. 1992).

FOIA requires a federal agency to release all records responsive to a proper request except those protected from disclosure by one or more of nine enumerated exemptions set forth at 5 U.S.C. § 552(b). A district court is authorized "to enjoin [a federal] agency from withholding agency records or to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B); see Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 139 (1980). The agency has the burden of proving that "each

document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements."  Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978) (internal citation and quotation omitted); see also Maydak v. Dep't of Justice, 218 F.3d 760, 764 (D.C. Cir. 2000) (the government has the burden of proving each claimed FOIA exemption).  The district court may award summary judgment to an agency solely on the basis of information provided in affidavits or declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981); see also Vaughn v. Rosen, 484 F.2d 820, 826 (D.C. Cir. 1973). Although the court conducts *de novo* review of an agency's invocation of a FOIA exemption, 5 U.S.C. § 552 (a)(4)(B), in the context of national security exemptions, agency declarations should be given "substantial weight." Campbell v. Dep't of Justice, 164 F.3d 20, 30 (D.C. Cir. 1998) (internal citation omitted).

## DISCUSSION

I.  **Propriety of "Glomar" Response**

In response to ICB's request for records, the CIA stated that it could neither confirm nor deny the existence or nonexistence of the information sought by ICB, citing Exemptions (b)(1) and (b)(3). Such a response by an agency in a FOIA case is called a "Glomar" response.  See Phillippi v. CIA, 546 F.2d 1009 (D.C. Cir. 1976).  A "Glomar" response applies "in cases where to answer the FOIA inquiry would cause harm cognizable under a [ ] FOIA exception -- in other words, in cases in which the existence or nonexistence of a record is a fact exempt from

disclosure under a FOIA exception." Wilner v. Nat'l Sec. Agency, 592 F.3d 60, 70 (2d Cir. 2009) (quoting Gardels v. CIA, 689 F.2d 1100, 1003 (D.C. Cir. 1982). And "[w]hen the Agency's position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal." Phillippi, 546 F.2d at 1013. Such agency affidavits may be submitted by an official who coordinated the search, and do not need to be from each individual who participated in the search. See Riquelme v. CIA, 453 F. Supp. 2d 103, 107 (D.D.C. 2006) (citing Safecard Servs. v. SEC, 926 F.2d 1197, 1201 (D.C. Cir. 1991)). A "Glomar" response "is proper if the fact of the existence or nonexistence of agency records falls within a FOIA exemption." Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007) (internal citations omitted). In considering the propriety of a "Glomar" response, then, courts apply the general exemption review standards established in non-"Glomar" cases. See id. at 374 (citing Gardels, 689 F.2d at 1103-05).

In support of its partial summary judgment motion, the CIA submitted a declaration from Ralph S. DiMaio, the Information Review Officer for the National Clandestine Service ("NCS") of the CIA. In this declaration, the CIA argues that it can neither confirm nor deny the existence or nonexistence of records on a particular foreign national in order "to safeguard intelligence sources and methods, as well as U.S. foreign relations." See DiMaio Decl. ¶¶ 14, 16. The CIA states that the mere confirmation or denial of the existence of responsive materials would reveal a classified fact -- namely, whether the CIA has gathered information on the specific foreign national. Id. ¶ 14.

ICB challenges the CIA's invocation of a "Glomar" response under both Exemptions 1 and 3 and the sufficiency of the DiMaio declaration. ICB argues that the CIA failed to perform

an adequate search because (1) it failed to search other directorates beyond the NCS; (2) it did not describe its method of record-keeping; and (3) it did not explain why a search of other directorates outside of NCS would only produce information properly subject to a "Glomar" response. Pls.' Mem. in Support of Pls.' Opp. to Def's Mot. for Partial Summ. J. and Pls.' Cross-Mot. for Summ. J. ("Pls.' Mem.") [Docket Entry Nos. 27 and 28] at 1-2. ICB also asserts that "the CIA made no showing that acknowledging the existence or nonexistence of the requested documents in its files would reveal any information about its classified activities, given the nature of the requests and the . . . ways in which the documents could have landed in the CIA's files." Id. Finally, ICB contends that a "Glomar" response is inappropriate here because the government "has publicly acknowledged that the Kuwaiti detainees are (or were) detained in . . . Guantanamo . . . and the CIA itself has acknowledged that the agency is active at that prison." Id. at 2. Because the question of the CIA's acknowledged interest in the detainees, as well as the adequacy of the CIA's search for information responsive to ICB's FOIA requests, hinges on whether the CIA properly invoked a "Glomar" response, the Court must resolve whether the CIA was entitled to invoke a "Glomar" response under either exemption claim.

A.    Exemption 1

FOIA's Exemption 1 permits agencies to withhold records if they are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). To show that it has properly withheld information under FOIA Exemption 1, an agency must show both that the information was classified pursuant to the proper procedures and that the withheld information meets the standard for classification. See

<u>Salisbury v. United States</u>, 690 F.2d 966, 971-72 (D.C. Cir. 1982).

The CIA relies on Executive Order 12,958,[2] as amended by Executive Order 13,292, to support its invocation of Exemption 1. Executive Order 12,958 allows an original classification authority to classify information only if "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security," and where such damage can be identified or described. 60 Fed. Reg. 19,825, 19,826 § 1.2(a)(4). However, only certain types of information can be exempted from disclosure pursuant to Executive Order 12,958. Such information includes that characterized as concerning "intelligence sources or methods" or the "foreign relations... of the United States," 60 Fed. Reg. at 19,826 § 1.5(c)-(d), both of which are grounds raised by the CIA for the information here. The CIA advances two arguments that the information sought falls within Executive Order 12,958. It claims that "clandestine intelligence interest in a specific individual represents an intelligence activity, source, and/or method" and is classified information within the meaning of Executive Order 12,958, and that unauthorized disclosure could reasonably be expected to cause serious damage to national security. DiMaio Decl. ¶ 23. The Agency also asserts that information about a foreign national is properly classified under Executive Order 12,958 because it concerns U.S. foreign relations, and disclosure could reasonably be expected to "adversely affect" U.S. foreign relations. <u>Id.</u> ¶¶ 30, 36.

ICB disputes these claims in three ways. The crux of ICB's first argument is that

---

[2] Executive Order 12,958 and all amendments thereto have been superseded by Executive Order 13,526, 75 Fed. Reg. 707 (Dec. 9, 2009). The language relied on by the CIA, found in Executive Order 12,958, also appears in Executive Orders 13,292 and 13,526. For the sake of clarity, then, all citations are to provisions found in Executive Order 12,958.

confirmation or denial by the CIA regarding its possession of documents relating to the Guantanamo detainees gives away nothing about the CIA's methods or interest. See Pls.' Mem. at 7. ICB contends that the records sought relate to "incidents of the detainees' lives and their treatment by the U.S. government at the Guantanamo facility" and that such information "would not necessarily relate to intelligence collection by the NCS." Id. at 7. In support of this point, ICB speculates that these documents "are (or may be) circulated among the various stakeholders at Guantanamo, or generated within the CIA as a matter of administrative routine." Id. at 10. ICB observes that because "[t]he detainees are (or were) prisoners in a completely controlled environment, available to be photographed or recorded . . . at any time, for any purpose," id. at 11, confirmation or denial by the CIA that it possesses certain documents about the detainees "does not reveal the target of the investigation, the type of abuse, or the existence or nonexistence of CIA's specific foreign intelligence activities," id. at 12. The second argument ICB advances is premised on the sufficiency of the declaration submitted by Mr. DiMaio. ICB argues that the declaration fails adequately to describe the risks to national security raised by the FOIA requests at issue. Id. at 7-12. Instead, ICB claims, the CIA simply offers generalized national security concerns that are inapposite to this case. Id. at 7-12. Finally, as a third argument, ICB asserts that it is disingenuous for the CIA to refuse to confirm or deny an interest in the detainees because it is "well-known" that "the U.S. Government has . . . an intelligence interest in these detainees," and points to "their presence in a military prison . . . after being captured in war-torn Afghanistan" as a "clear indication of the government's interest." Id. at 7, 12.

The Court is mindful of its duty to "determine the matter *de novo*" and that declarations by the CIA should be evaluated to ensure that they provide "reasonably specific detail" to justify

an agency's response to a FOIA request. But, at the same time, the Court must also acknowledge the substantial weight accorded to agency affidavits with respect to the classified status of a record. See Salisbury, 690 F.2d at 970 (internal citations and quotations omitted); Miller v. Casey, 730 F.2d 773, 776 (D.C. Cir. 1984) (internal citations omitted). Hence, while the review of the CIA's "Glomar" response invoking Exemption 1 must be careful, it remains somewhat deferential to the CIA's national security expertise.

Here, the CIA provided "reasonably specific detail" about the classified nature of the information, as well as the harm to national security and the adverse effect on foreign relations if the CIA was required to confirm or deny the existence of any records about the specific detainees at issue. The CIA stated that its "clandestine intelligence interest in a specific individual represents an intelligence activity, source, and/or method" and that "official acknowledgment that the CIA maintains information concerning a particular foreign national" could lead to the perception that the CIA has collected intelligence information on a citizen or resident alien, which could adversely affect U.S. foreign relations with that nation. DiMaio Decl. ¶¶ 23, 30. The CIA explained that it benefitted from the uncertainty operatives had of not knowing when or how they are being monitored by the Agency and that revealing this information by confirming or denying records would disclose to a foreign intelligence service the CIA's capabilities and interests. Id. ¶ 24. In addition, once an intelligence method, and the fact of its use in a certain situation, is discovered, its use by the CIA in the future is "seriously jeopardized." Id. ¶ 26. Moreover, foreign intelligence services could use information about the CIA's interest as a way to determine how to allocate their own resources in circumventing the CIA, including identifying potential CIA sources, which would "thwart" the CIA's intelligence-gathering efforts and make

them "more difficult . . . resulting in a loss of valuable intelligence information." Id. ¶ 27.

The Agency detailed the harms that could result from *confirming* that it kept records for these detainees. It stated that admission by the CIA that it possessed intelligence information would alert the foreign national, other associates, successors, and foreign intelligence services, that CIA intelligence methods had been applied against that national, and that such parties could then take countermeasures to identify and frustrate the CIA's intelligence gathering methods, making future activities undetectable by the CIA. Id. ¶ 17. The CIA also stated that collaborators of a foreign national, once alerted that the CIA takes a specific interest in a foreign national, could cease engaging in certain activities, with negative results for the CIA. Id. ¶ 17. Furthermore, "clandestine human sources" who had given the CIA information on the foreign national could be detected, suffer retaliation, and stop giving information. Id. ¶ 17.

The CIA then described the harms that could result from *denying* the existence of records relating to these detainees. The CIA explained that its denial would essentially admit to that national, his or her associates and successors, as well as foreign intelligence services, that efforts to conceal any activities from the CIA had been successful. This would, in turn, alert others that the CIA's intelligence methods had been defeated, and the pattern of successful concealment could be continued to the CIA's detriment. Id. ¶ 18.[3]

By admitting it had intelligence information about a certain foreign national, the CIA would essentially "disclos[e] to our adversaries the specific persons and areas in which CIA is

---

[3] The CIA also stated that requests to the Agency on whether it maintains records on a particular foreign national "must be handled by neither confirming nor denying the existence of such records" in order for such a response to be effective, and that such consistency is "the only means by which CIA can protect the identities of actual sources and intelligence targets . . . ." DiMaio Decl. ¶ 16.

interested, and upon which it focuses its methods and resources," id. ¶ 20, giving "information to foreign intelligence operatives about which activities the CIA can and cannot monitor, and the "sources or methods by which CIA obtained intelligence on that person," id. ¶ 24. Mr. DiMaio also stated that he had determined "that official acknowledgment that the CIA maintains information containing a particular foreign national could be construed by the foreign government . . . to mean that CIA has collected intelligence information on or recruited one of its citizens or resident aliens." Id. ¶ 30. An official acknowledgment that the CIA maintains information about a particular individual could also constitute an admission that the CIA has collected, or intends to collect, information on specific foreign targets during specific time periods. Id. ¶ 31. According to the CIA, if its interest in the foreign national was publicly acknowledged, then countries where that foreign national lived or visited could respond negatively to the U.S. in reaction to this disclosure, either diplomatically, economically, or in the form of "anti-American propaganda," or use such information as "a reason for retaliation against former associates, including American citizens or other American interests." Id. ¶ 31. The Agency also stated that this harm could be magnified if a "foreign intelligence service were to submit multiple FOIA requests," i.e., for information regarding all nationals suspected of being CIA collaborators, and the CIA was forced to respond. This would give the foreign intelligence service information to greatly aid it in eliminating the CIA's intelligence network in that country. Id. ¶ 19. In addition, the CIA distinguished its intelligence interest in particular "high value detainees" from the present circumstance, noting that its disclosures of an interest in those detainees did not constitute an official acknowledgment of the existence or nonexistence of specific information on any other foreign national, including the four Kuwaiti detainees here. Id.

¶ 31 n.6.

Although ICB attacks the sufficiency of the CIA's showing that the requested information is covered by Exemption 1, and that disclosure of such information would constitute the harm that Exemption 1 was meant to safeguard against, this Court finds that the DiMaio declaration was "reasonably detailed" to support the CIA's invocation of a "Glomar" response based on Exemption 1.[4] As the D.C. Circuit noted in Wolf, "any . . . agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm." Wolf, 470 F.3d at 374 (citing Haperin v. CIA, 629 F.2d 144, 149 (D.C. Cir. 1980). The question, then, is whether the agency's justification for invoking a FOIA exemption "appears 'logical' or 'plausible.'" Id. at 374-75 (citing Gardels, 689 F.2d at 1105; Hayden v. NSA, 608 F.2d 1381, 1388 (D.C. Cir. 1979)). Based on the CIA's explanation in the DiMaio declaration, it is both logical and plausible that disclosure by the CIA of the existence or nonexistence of records on a particular foreign national, including any records relating to the time that individual was detained at Guantanamo, would pose great harm to national security and to the United States' foreign relations with other countries. See Am. Civil Liberties Union v. U.S. Dep't of Def., 628 F.3d 612, 625 (D.C. Cir. 2011) ("[I]t is both plausible and logical that the

---

[4] The DiMaio declaration submitted in support of this action contains greater detail than the one discussed by the D.C. Circuit in Morley v. CIA, 508 F.3d 1108, 1126 (D.C. Cir. 2007), which, as the D.C. Circuit noted, contained only a single allusion to the need for a "Glomar" response, but was not offered in justification of such a response. While plaintiff relies on Morley, neither that court nor the CIA considered the issue of whether the existence of records of a foreign national could be protected by a "Glomar" response. Instead, the records requested were those regarding a deceased CIA official whose nationality does not appear to have been at issue. Wolf, decided the same year, is more relevant to this Court's consideration since it involved the CIA's invocation of a "Glomar" response to a FOIA request for records of a foreign national.

disclosure of information regarding the capture, detention, and interrogation of detainees would degrade the CIA's ability to carry out its mission [of collecting and analyzing intelligence]."); Wolf, 473 F.3d at 375 (noting that "the Supreme Court has recognized the broad sweep of 'intelligence sources' warranting protection in the interest of national security") (citing Fitzgibbon v. CIA, 911 F.2d 755, 760-63 (D.C. Cir. 1990)); Riquelme v. CIA, 453 F. Supp. 2d 103, 110 (D.D.C. 2006) (crediting as reason for CIA's "Glomar" response that acknowledgment of clandestine activity by the CIA would "adversely affect U.S. foreign relations" and could cause retaliation against American citizens).

ICB has neither alleged nor established that the CIA keeps records on *all* detainees or, more specifically, the records requested here, including, among other things, information on disciplinary violations, medical records, and images or recordings of detainees. For the CIA to state, then, that it has records about a detainee -- including his or her detention conditions, or any recordings or images (among other things) of the likeness of the detainee -- would indicate an interest in that particular detainee that could have ramifications with respect to national security or U.S. foreign relations. Similarly, to state that no such records exist about that detainee could alert others that the CIA has no interest, which would also unwittingly provide information to foreign intelligence services, and other individuals, about the CIA's intelligence methods, interests, and capabilities.[5] See Subh v. CIA, --- F. Supp. 2d ----, 2011 WL 149855, at * 5

[5] This Court agrees with the CIA that even the release of seemingly insignificant or benign information "could have significant adverse effects when combined with other data." See Def's Mem. in Support of its Mot. for Partial Summ. J. at 12; DiMaio Decl. ¶ 28; Fitzgibbon, 911 F.2d at 763 ("This Court has established that in considering the potential harm arising from disclosure of a source or method, '[w]e must take into account . . . that each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance itself.'") (internal

-14-

(D.D.C. Jan. 19, 2011) (finding CIA's "Glomar" response appropriate in context of person-specific FOIA request for records concerning any intelligence checks on that individual); People for the Am. Way Found. v. Nat'l Sec. Agency / Cent. Sec. Serv., 462 F. Supp. 2d 21, 31 (D.D.C. 2006) ("Glomar" response by National Security Agency to request for records related to surveillance of plaintiff was appropriate, because confirmation or denial that plaintiff was an intelligence interest would allow "adversaries . . . to draw conclusions" about NSA's capabilities, sources, and methods).

Although ICB disputes the CIA's assessment of the potential harm resulting from the CIA's confirmation or denial of the existence of records for the four named detainees, ICB has not provided any convincing evidence indicating that the CIA has already acknowledged the existence of CIA records (or even an interest) regarding the detainees in question, nor does ICB allege that the CIA's declaration was submitted in bad faith. See Riquelme, 453 F. Supp. 2d at 114 (plaintiff asserting prior disclosure bears the burden of producing the information in the public domain that specifically duplicates the withheld material) (internal citation omitted); Pls.' Reply in Support of its Cross-Mot. for Summ. J. ("Pls.' Reply") at 9 ("ICB has not asserted . . . that the DiMaio declaration was made in bad faith."). Hence, this Court "must hew to the statutory mandate to place '*substantial weight*'" on the CIA's plausible and uncontradicted assessment of risks, and "would . . . [be] remiss in disregarding them." Miller, 730 F.2d at 777 (emphasis in original) (citing Gardels, 689 F.2d at 1106. Hence, the Court concludes that the CIA has adequately demonstrated that the information withheld -- namely, the existence or nonexistence of the records requested  -- falls within Exemption 1.

_____

quotation and citation omitted).

ICB suggests that the similarities between the DiMaio declaration and the declaration submitted in Wolf should prompt this Court to take a skeptical view of the CIA's reliance on national security concerns to support its invocation of a "Glomar" response here. The Court finds no reason to do so. The D.C. Circuit has rejected a similar argument by plaintiffs that courts should require more explanation from agencies that use similar, or even the same, language in their affidavits submitted to support claimed FOIA exemptions. Larson v. Dep't of State, 565 F.3d 857, 868 (D.C. Cir. 2009). The court reasoned that "when the potential harm to national security in different cases is the same, it makes sense that the agency's stated reasons for non-disclosure will be the same. We are . . . not disquieted by [the agency's] similar responses in similar cases . . . [and] similar exemption explanations . . . is not a cause for further judicial inquiry." Id.

Likewise, the similarity of Mr. DiMaio's declaration to the one submitted in Wolf does not alarm this Court. To the contrary, it reassures the Court in its determination that the Agency's "Glomar" response was appropriately invoked. In Wolf, the district court found the CIA's "Glomar" response adequately supported by its declaration, which cited very similar reasons to those advanced before this Court as to why confirmation or denial by the CIA that it had records about a specific foreign national would threaten national security. See Wolf v. CIA, 357 F. Supp. 2d 112, 116 (D.D.C. 2004). Although the D.C. Circuit ultimately found that the CIA had waived its ability to invoke a "Glomar" response, when its then-Director read directly from CIA dispatches referencing the foreign national at issue during congressional testimony, the court of appeals did not challenge the reasons proffered by the CIA in support of its "Glomar" response as an initial matter. See Wolf, 473 F.3d at 377 (finding it plausible that "confirming or denying

[the] CIA's interest in a foreign national reasonably could damage sources and methods by revealing CIA priorities, thereby providing foreign intelligence sources with a starting point for applying countermeasures against the CIA and thus wasting Agency resources").[6]

Absent other compelling reasons, mere similarities between declarations do not prompt this Court to second-guess the CIA's reasons, as established in the DiMaio declaration, that the existence or nonexistence of records kept by the CIA on a foreign national is classified information and that disclosure would create a harm to national security or U.S. foreign relations. Indeed, although not dispositive here, the Court also notes that the CIA has pointed to the need for consistency in the Agency's policy on the treatment of FOIA requests for as-yet-undisclosed records about foreign nationals, so it is not surprising to see similarities in the reasons given by the Agency for why a "Glomar" response is necessary in such circumstances. Hence, having considered the parties' arguments and the record herein, the Court finds that the Agency's "Glomar" response was appropriately supported under Exemption 1.

    B.    Exemption 3

The CIA's showing under Exemption 1 is sufficient to uphold its "Glomar" response, but the Agency also claims that ICB's FOIA requests fall within Exemption 3, by virtue of section 102A(i)(1) of the National Security Act of 1947 ("NSA"), as amended, 50 U.S.C. § 403-1(i)(1) and section 6 of the Central Intelligence Act of 1949 ("CIA Act"), as amended, 50 U.S.C. §

---

[6] In Varfells v. CIA, a substantially similar declaration was submitted by Mr. DiMaio in support of the CIA's "Glomar" response, although the CIA's ability to invoke a "Glomar" response was not at issue in that case. See 717 F. Supp. 2d 110, 116 (D.D.C. 2010). Mr. DiMaio was also the declarant in support of the CIA's "Glomar" response in <u>Subh v. CIA</u>, which ruled that the CIA's "Glomar" response was appropriate in the context of a FOIA request for records concerning any intelligence checks on a specific individual. 2011 WL 149855, at * 5-6.

403(g).  To determine whether the CIA's "Glomar" invocation can be sustained under Exemption

3, the Court considers whether the statutes invoked are ones contemplated by Exemption 3, and

whether the withheld material satisfies the criteria of the particular statute. 5 U.S.C. § 552(b)(3);

see also CIA v. Sims, 471 U.S. 159, 167 (1985).  Section 102A(i)(1) of the NSA states that the

Director of National Intelligence "shall protect intelligence sources and methods from

unauthorized disclosure."  And section 6 of the CIA Act states that the DNI shall be responsible

for protecting intelligence sources and methods from unauthorized disclosure and is exempt from

laws requiring the publication or disclosure of the organization, functions, names, official titles,

salaries, or numbers of personnel employed by the CIA.

As with the Exemption 1 claim, the CIA relies on the DiMaio declaration to support its

claim that the "Glomar" response is warranted under Exemption 3.  ICB, for its part, concedes

that the National Security Act is a "withholding statute" for Exemption 3 purposes. Pls.' Mem. at

16.  However, as with its challenge to the CIA's "Glomar" response under Exemption 1, ICB

argues that the CIA's "Glomar" response under Exemption 3 is inadequately supported.

As an initial matter, the provisions of the NSA and the CIA Act cited by the Agency

plainly are statutes contemplated by Exemption 3.  See Subh, 2011 WL 149855, at * 3 n.2 ("It is

well established that these provisions of the [NSA] and the [CIA] Act are 'precisely the types of

statutes comprehended by exemption 3.'") (internal citations omitted).  Moreover, as noted above,

ICB does not dispute that the NSA falls within Exemption 3's purview.

The Court also finds that the CIA's invocation of these statutes to support its "Glomar"

response under Exemption 3 was proper, for the same reasons described in the Exemption 1

discussion above. See Wolf, 473 F.3d at 377-78 ("As with Exemption 1, the Agency relies on the

[same] affidavit to establish that disclosure of information regarding whether or not CIA records of a foreign national exist would be unauthorized under Exemption 3 because it would be reasonably harmful to intelligence sources and methods. . . . [The affidavit's] detailing of harm satisfies the requirements of Exemption 1, and, coupled with the greater deference afforded the Agency under the National Security Act, we believe that the CIA also properly invoked Exemption 3 in support of its <u>Glomar</u> response."); <u>see also</u> <u>Hunt v. CIA</u>, 981 F. 2d 1116, 1119-20 (9th Cir. 1992) (reversing district court and finding that "Glomar" response was appropriately applied to the existence of records about a foreign national under Exemption 3); <u>Wheeler v. CIA</u>, 271 F. Supp. 2d 132, 136, 140-41 (D.D.C. 2003) (finding "Glomar" response appropriately invoked under Exemption 3 as to the existence of person-specific records).  Generally, the CIA's assertions of harm to intelligence sources and methods under the National Security Act are accorded great deference.  <u>See</u> <u>Wolf</u>, 473 F.3d at 377 (citing <u>Sims</u>, 471 U.S. at 168-69).  Hence, having found that the information requested by ICB constitutes "intelligence sources and methods", the Court agrees with the CIA's reliance on Exemption 3 in invoking its "Glomar" response.

## II.    **The CIA's Known Interest in Guantanamo Detainees**

ICB states that it is not challenging the CIA's invocation of a "Glomar" response on waiver grounds, but it also claims that the "Glomar" response is not justified because "[i]t is not a secret" that the detainees were in the U.S. government's custody at Guantanamo.  Pls.' Mem. at 13.  To avoid any doubt, the Court will address why ICB's reliance on the known interest by the U.S. government in Guantanamo detainees, whether characterized as a "waiver" argument or otherwise, is unavailing.

ICB cites the "repeated[] acknowledgment" by the Department of Defense, in related litigation regarding other ICB FOIA requests, that it has an intelligence interest in the Kuwaiti detainees; that, ICB argues, demonstrates that the CIA, in turn, has already acknowledged an intelligence interest in the detainees, and hence should bar the use of a "Glomar" response with respect to those same individuals. See id. at 13. ICB further states that the CIA "has acknowledged an intelligence role" at Guantanamo and that the CIA's involvement in Guantanamo is widely and publicly known. To support its position, ICB refers to the following: (1) an interview with Charlie Rose where then-CIA Director Michael Hayden stated that Khalid Sheik Muhammad was in Guantanamo, and that the CIA "had made the judgment that the intelligence value of those individuals, the 14 that we moved there last September and the one additional person that we moved there this past year . . . have degraded to the point that these other needs now take dominance"; (2) press accounts describing the operation of a CIA facility on the base itself; and (3) a Red Cross report stating that CIA medical personnel were participating in detainee interrogations. See Pls.' Mem. at 14.

In order for the CIA to be precluded from asserting a "Glomar" response with respect to a request for records about the four detainees, the CIA must have officially acknowledged the existence of records regarding the same detainees. ICB has the burden of pointing to specific information in the public domain that duplicates the information being withheld. Afshar v. Dep't of State, 702 F.2d 1125, 1130 (D.C. Cir. 1983). An official acknowledgment by the CIA must satisfy three criteria: the information requested (1) must be as specific as the information previously released; (2) must match the information previously disclosed; and (3) must have already been made public through an official and documented disclosure. Wolf, 473 F.3d at 378

(citing Fitzgibbon, 911 F. 2d at 765);[7] see also Am. Civil Liberties Union, 628 F.3d at 620-21.

ICB has pointed to no evidence that the CIA has specifically acknowledged that it possesses records with respect to the four individuals who are the subjects of ICB's FOIA requests. Instead, ICB references an interview with then-CIA Director Hayden about moving Khalid Sheikh Muhammad and several others to Guantanamo, but does not allege that the four Kuwaiti detainees in question here were among the other individuals referenced by the Director. Compare Wolf v. CIA, 473 F.3d at 379 (finding that, where CIA Director, while testifying before Congress, explicitly read excerpts of CIA dispatches relating to the particular foreign national in question, "Glomar" response as to the existence *vel non* of records was improper since such fact was "officially acknowledged") with Am. Civil Liberties Union, 628 F.3d at 620-21 (finding that, where only generic information about confinement conditions and interrogation techniques regarding certain high-value detainees had been released, documents specific to a particular high-value detainee were properly withheld since they would have revealed far more than the previously released records), and Am. Civil Liberties Union v. Dep't of Def., — F. Supp. 2d ----, 2010 WL 4449375, at * 1, 5 (S.D.N.Y. Oct. 25, 2010) (finding "Glomar" response appropriate

_____

[7] The D.C. Circuit in Wolf noted that "agency waiver" is usually invoked "to overcome FOIA exemptions" and that the "official acknowledgment standard" had not yet been applied in the context of a "Glomar" response. Wolf, 473 F.3d at 378. However, without explicitly ruling on whether the same standards for agency waiver of FOIA exemptions similarly apply to an agency's invocation of a "Glomar response," the D.C. Circuit nevertheless proceeded to analyze the same considerations in deciding whether the CIA's "Glomar" response was waived by its previous disclosure that it had certain records on the same foreign national. Id. at 378-79. In addition, it has been frequently noted that in cases where a "Glomar" response is at issue, the same analysis as to whether the "Glomar" response is appropriately tethered to one of the nine-enumerated FOIA exemptions, should apply as in non-"Glomar" cases considering the same issue -- the propriety of the claimed exemption. See Wilner v. Nat'l Sec. Agency, 592 F.3d 60, 68 (2d Cir. 2009).

for FOIA request for information relating to the detention and treatment of prisoners at the Bagaram Internment Facility in Afghanistan even where plaintiffs had submitted "countless statements," allegedly by the CIA, regarding the CIA's involvement in Bagaram).

ICB's reliance on news articles and a report issued by the International Committee for the Red Cross is similarly unavailing. Pls.' Mem. at 15. ICB attempts to use these sources to support its contention that "[t]he CIA is widely known as a stakeholder and participant in the operations of Guantanamo." Pls.' Mem. at 15. However, this is not information "made public through an official and documented disclosure." See Am. Civil Liberties Union, 628 F.3d at 621-22 ("Because the Red Cross report was not 'made public through an official and documented disclosure,' the information it contains cannot be considered 'officially acknowledged' . . . . Similarly, a journalist's version . . . is hardly the same thing as an official government acknowledgment.").

Finally, ICB's reliance on the Department of Defense's disclosure of its own intelligence interest in the four detainees is also unavailing, since disclosure by one agency cannot be imputed to another agency. See Frugone v. CIA, 169 F.3d 772, 773-74 (D.C. Cir. 1999) (finding that CIA could give a "Glomar" response regarding the existence of records related to the employment of an alleged "covert employee" of the CIA, even where such employment was already confirmed by another agency, because the court did not "deem 'official' a disclosure made by someone other than the agency from which the information is being sought") (internal citations omitted). The same reasoning applies even where another agency may have in its possession information obtained and originating from the CIA. Id. at 775 ("Mindful that courts have little expertise in either international diplomacy or counterintelligence operations . . . we cannot treat the

statements of [another agency] . . . as tantamount to an official statement of the CIA"); <u>Varfells</u>,

717 F. Supp. 2d at 120 (holding that the FBI's disclosure of records, which included redactions of

CIA-originated information about a foreign national, did not constitute an 'official

acknowledgment' by the CIA that it had any record on that national).  The Court finds that

information regarding the existence of records held by the CIA for the four detainees has not

been officially acknowledged by the CIA so as to bar the Agency from asserting a "Glomar"

response based on either Exemption 1 or Exemption 3.

**III.**    **Adequacy of Search**

Having found that the CIA's "Glomar" response was properly sustained under

Exemptions 1 and 3, the Court turns to the issue of the adequacy of the CIA's search.  ICB makes

much of the fact that the CIA's declarant, Mr. DiMaio, is an Informational Review Officer for the

NCS.  It argues that his declaration must be construed as being limited to NCS-based records

only; therefore, according to ICB, Mr. DiMaio is an inadequate spokesperson for the entire CIA.

ICB also contends that all potentially responsive documents in the CIA's possession could not

possibly originate with, or implicate the interests of, NCS.  Hence, ICB concludes that the CIA

should be required to describe the structure of its file systems, both in-and-outside the NCS, and

present the Court with sufficient information on the Agency's systems of records to supports its

claim that the "Glomar" response applies to all potentially responsive documents.  <u>See</u> Pls.' Mem.

at 1, 4-6.

The CIA, for its part, responds that its choice of declarant is proper because NCS is

responsible for, among other things, "conducting CIA's foreign intelligence and

counterintelligence activities . . . conducting liaison with foreign intelligence and security

services . . . and coordinating CIA support to other federal departments and agencies." DiMaio

Decl. ¶ 2; Def's Reply in Support of its Mot. for Partial Summ. J. and Opp. to Pls.' Cross-Mot. for

Summ. J. ("Def's Reply") at 4.  The CIA further contends that Mr. DiMaio, as Information

Review Officer for NCS, is the proper declarant because he is both "familiar with this civil action

and the underlying FOIA requests" and authorized "to conduct classification reviews and to make

original classification and declassification decisions."  DiMaio Decl. ¶¶ 1, 4, 5; see Def.'s Reply

at 4.

The Court agrees with the CIA.  The DiMaio declaration clearly states that as NCS

Information Review Officer, he coordinates _CIA_ support to other federal departments and

agencies, rather than just NCS-specific support.  DiMaio Decl. ¶ 2 (emphasis added).  In

addition, DiMaio states that "[a]s a senior CIA official" he is "authorized to conduct

classification reviews and to make original classification and declassification decisions."  DiMaio

Decl. ¶ 4.  The declaration does not indicate that Mr. DiMaio's authority or his role is limited to

NCS-specific documents.[8]

More importantly, because the Court has already determined that the CIA's "Glomar"

response was appropriate under Exemptions 1 and 3, and was adequately supported by affidavit,

review of the adequacy of the search is unnecessary.  Butler v. Drug Enforcement Admin., 1:05-

cv-01798 (JDB), 2006 WL 398653, at *5 n.2 (D.D.C. Feb. 16, 2006) (internal citations omitted)

("Since the Court has found that the defendant's disposition of plaintiff's records request by way

of a "Glomar" response was appropriate, review of the adequacy of the search is unnecessary.");

---

[8]  As this Court previously noted, Mr. DiMaio, acting in the same capacity as he does in
this case, submitted similar declarations in Varfells and Subh to support the CIA's "Glomar"
response to certain FOIA requests.

see also  Wolf, 473 F.3d 374 n.4 (adequacy of search not at issue when the presence of the "Glomar" response narrows the FOIA issue to the existence of records *vel non*).

## CONCLUSION

For the reasons detailed above, the Court will grant the CIA's motion for partial summary judgment as to the appropriateness of its "Glomar" response with respect to paragraphs 65 and 66 of the plaintiff's amended complaint.  For the same reasons, the Court will deny plaintiffs' cross-motion for summary judgment on the adequacy of the CIA's search.  A separate Order accompanies this Memorandum Opinion.

/s/ John D. Bates
JOHN D. BATES
United States District Judge

Date: March 31, 2011